ORIGINAL

Receipt No. 000575

FILED
JUN 18 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**GRUNLEY-WALSH, LLC**
**(f/k/a Grunley-Walsh Construction JV)** *

**Plaintiff,** *

**v.** * **Case No.: 07-390 C**
**Judge:**

**THE UNITED STATES OF AMERICA** * **(Top Soil Change Work Claim)**

**Defendant.** *

* * * * * * * * * * * * *

**COMPLAINT**

Plaintiff, Grunley-Walsh, LLC, formerly known as Grunley-Walsh Construction JV, ("Grunley-Walsh"), by its counsel, Roger C. Jones, Esq., of Huddles Jones Sorteberg & Dachillé, P.C., sues the United States of America ("United States"), and for its Complaint in the above matter, respectfully states as follows:

**Jurisdiction**

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1491. Plaintiff brings this action pursuant to the Contract Disputes Act of 1978, as amended, 41 U.S.C. § 601 *et seq.* In addition, this action is related to Case Nos. 1:06-cv-00721-CFL, 1:06-cv-00723-CFL, 1:04-cv-00815-CFL, 1:06-cv-00816-CFL, 1:06-cv-00837-CFL, 1:07-cv-00085-CFL, 1:07-cv-00189-CFL, 1:07-cv-00190-CFL, 1:07-cv-00197-CFL, 1:07-cv-00200-CFL and 1:07-cv-00281-CFL, as it arises out of the same contract and, therefore, should be consolidated with the aforesaid cases.

2. By Orders dated March 14, 2007 and May 31, 2007, this Court consolidated Case Nos. 1:06-cv-00721-CFL, 1:06-cv-00723-CFL, 1:04-cv-00815-CFL, 1:06-cv-00816-CFL, 1:06-cv-00837-CFL, 1:07-cv-00085-CFL, 1:07-cv-00189-CFL, 1:07-cv-00190-CFL, 1:07-cv-00197-

CFL, 1:07-cv-00200-CFL and 1:07-cv-00281-CFL and directed that all future filings designate Case No. 1:06-cv-00721-CFL as the lead case.

## The Parties

3. Plaintiff, Grunley-Walsh, is a general contractor in the construction industry organized and existing under the laws of the State of Maryland, with its principal place of business located at 5010 Nicholson Lane, Suite 200, Rockville, Maryland 20852.

4. Defendant is the United States of America.

## The Contract

5. On May 6, 1998, the United States, acting by and through the Department of the Interior – National Park Service, awarded Grunley-Walsh an Indefinite Quantity Contract (Contract No. 1443CX305998901) (the "Contract") to stabilize and preserve the Washington Monument (the "Project"). The Contract is incorporated by reference herein, but is not attached due to its voluminous nature. Defendant has a copy of the Contract in its possession.

6. Pursuant to Contract Modification No. 0007 ("Contract MOD 7"), dated November 15, 2001, the General Provisions to the Contract were deleted and replaced with revised contract clauses which included certain FAR provisions incorporated by reference. A copy of MOD 7 is attached hereto as **EXHIBIT A.** Three of these provisions included the Changes clause (FAR 52.243-04 August 1987), the Disputes clause (FAR 52.233-01 December 1998) and the Differing Site Conditions clause (FAR 52.236-02 April 1986).

7. In accordance with the Contract, on December 5, 2003, Grunley-Walsh was issued Task Order No. T3059989135 ("Task Order No. 35") in the amount of $13,993,216. Pursuant to Task Order No. 35, Grunley-Walsh was to construct and install an above ground security barrier system at the Washington Monument. More specifically, Grunley-Walsh was to

accomplish work the contained in the Project Requirements (Task Order No. 35, Attachment 1) and specifications and drawings prepared under previous Task Order by the Olin Partnership. A copy of Task Order No. 35, including its Attachment 1 Project Requirements is attached hereto as **EXHIBIT B**.

**The Certified Claim for Top Soil Change Work**

8. This action relates to a January 30, 2007 certified claim, in the amount of $259,863 submitted by Grunley-Walsh to the Contracting Officer (the "Certified Claim") pursuant to the Changes clause and the Disputes clause in the Contract. A copy of the Certified Claim is attached as **EXHIBIT C**.

9. By letter dated March 30, 2007 (copy attached as **EXHBIT D**), the Contracting Officer advised that a Final Decision on the Certified Claim would be issued by May 30, 2007.

10. By letter dated June 14, 2007 (copy attached as **EXHIBIT E**), the Contracting Officer issued a Final Decision denying the Certified Claim in its entirety.

11. As provided for by the Contract Disputes Act, this action is to appeal the denial of the Contracting Officer's Final Decision.

**Factual Background for the Certified Claim**

12. This claim stems from a mutual mistake at the time Task Order No. 35 was issued. The misunderstanding concerns what the parties believed they were agreeing to, with respect to the top soil work, when Task Order No. 35 was awarded for the lump sum negotiated price of $13,993,216. The contract documents do not reflect the parties' agreement. Further, the Contracting Officer's Final Decision confirms this misunderstanding and the mutuality of the parties' mistake. As such, the facts and circumstances leading up to the negotiated price for the Task Order No. 35 are relevant to understand the intent of the parties' agreement.

## Pre-Award Facts

13. Prior to Task Order No. 35, there were several Task Orders issued to effect the design development for the Project. After various preliminary studies, on April 11, 2002, Task Order No. 28 was issued for preparation/performance of Schematic Design and Design Development Services. In the course of providing these services, price and budget issues were constantly being addressed. Grunley-Walsh believed this information was necessary for the Park Service to procure funds in order to proceed with the future construction phase of the Project.

14. On May 16, 2003, the 100% Design Development drawings and specifications were issued. As these documents were simply for Design Development purposes, they clearly stated, "NOT FOR CONSTRUCTION." However, based on the issuance of these documents, Grunley-Walsh was able <u>to begin the process</u> of soliciting prices from subcontractors for performance of the construction work. Grunley-Walsh was also able to solicit value engineering suggestions that might help to reduce the cost of construction.

15. The May 16, 2003 Specifications included Section 02920 (copy is attached to the Certified Claim as **EXHIBIT 2**) which set forth the requirements for "Soil Preparation," including the requirements for various topsoil mixes to be utilized in different locations around the project site. The soil mixes varied based on the amount/percent of "base component material" that was to be utilized in each of the mixes. The specifications also required the base component material to be a mixture of "sand" and "sandy loam" (i.e. a classification of top soil), consisting of 2 parts sandy loam to 5 parts sand (see Specification Section 02920, pages 8-9, attached to the Certified Claim as part of **EXHIBIT 2**). Based on this criteria, the amount of sand to be mixed with organic material was going to be an unusually high percentage. It was also going to add significant cost to the price for the actual landscaping construction work.

16. This cost concern first became apparent in the summer of 2003 as Grunley-Walsh began receiving preliminary pricing from subcontractors to perform the work. For example, in an August 14, 2003 proposal received from Chapel Valley (attached to the Certified Claim as **EXHIBIT 3**), the proposed cost for the 3 different specified soil mixes ranged from $45 per cubic yard to as high as $65 per cubic yard. To put this cost in perspective, it is important to understand the plan was for each soil mix to be a minimum of 12" deep and the 65 acre site was going to require literally thousands and thousands of cubic yards of soil mix. The cost was expected to be several millions of dollars.

17. This fact concerning the costs for the soil mixes was communicated to the Park Service (Mike Donnelly) during the summer of 2003. Needless to say, Mr. Donnelly was astonished and he requested suggestions for reducing the price. To quote Mr. Donnelly, "we are the National Park Service; we can grow grass on rocks."

18. In response to Mr. Donnelly's request, Grunley-Walsh received an October 3, 2003 revised bid/pricing (copy attached to the Certified Claim as **EXHIBIT 4**) from Cherry Hill Construction to perform the site work. The base amount of this bid totaled $3,185,864, and was premised on excluding Specification Section 02920 altogether. Instead, Cherry Hill proposed to provide 6" (as opposed to 12") of off-site top soil (in lieu of the specified soil mixes) that would be in accordance with the District of Columbia DPW Standard Specification for Highways and Structures 1996, Section 822.1 – Topsoil (copy attached to the Certified Claim as **EXHIBIT 5**) (the "top soil alternative"). This top soil alternative contemplated a topsoil sand mix of not less than 15%; nor more than 50%. By contrast, the Specifications contemplated a sand mixture of up to 85%, depending on the soil mix locations. When Grunley-Walsh communicated this bid/price to the Park Service (Mike Donnelly and John M. Fox), they agreed with the topsoil

alternative concept proposed by Cherry Hill because of the significant price saving that would be achieved.

19. Thereafter, by email dated Monday, November 24, 2003 (copy attached to the Certified Claim as **EXHIBIT 6**), the Park Service (Mike Donnelly), forwarded to Grunley-Walsh a "Request for Price Proposal, Task Order #35." Even though this email was received the day before the November 25, 2003 drawings and specifications were issued, the RFP attached to the email stated, "[w]e request that you provide your price proposal directly to this office no later than November 25, 2003." The RFP also stated, **"[t]his Request for Price Proposal should be based on the 100% complete Specifications and Drawings for the referenced project."**

20. At the time (i.e., November 24, 2003), a 100% complete set of Specifications and Drawings did not exist for the project. The Contracting Officer's Final Decision expressly acknowledges this fact. Rather, all that existed was a 100% set of Design Development Specifications and Drawings, which specifically stated they were "NOT FOR CONSTRUCTION".

21. The email accompanying the Park Service's RFP also advised Grunley-Walsh the Park Service wanted to "negotiate" the RFP on Wednesday morning (i.e., November 26, 2003). A price proposal was submitted by Grunley-Walsh on November 25, 2003 and negotiations did, in-fact, occur on November 26, 2003. During these negotiations, it was made clear to the Park Service that Grunley-Walsh's site work price was from Cherry Hill, in the amount of $3,185,864, which included Cherry Hill's proposed alternative for topsoil (in lieu of the specified soil mix requirements). In fact, a copy of Cherry Hill's bid proposal (**EXHIBIT 4** to the Certified Claim) was provided to the park service as part of Grunley-Walsh's price submission.

22. As a result of the parties' negotiations, on Wednesday, November 26, 2003, Grunley-Walsh provided/emailed the Park Service their "Final, Final, Final, Proposal" in the total amount of $13,993,215.96 (copy attached to the Certified Claim as **EXHIBIT** 7). In this proposal, the Site Work price was identified as a specific line item, in the amount of $3,185,864; representing the bid amount Grunley-Walsh received from Cherry Hill, premised on Cherry Hill's alternative top soil approach.

23. Grunley-Walsh's "final, final, final, proposal" to the Park Service was not immediately accepted. After submission of the "final, final, final, proposal," the Government was closed for the Thanksgiving holiday. Eventually, on Friday, December 5, 2003, Grunley-Walsh understood the Park Service accepted the "final, final, final, proposal" when the Park Service issued Task Order No. 35, for the lump sum amount of $13,993,216 – the exact amount of Grunley-Walsh's proposal (rounded-up by 4¢ to the nearest dollar).

24. Task Order No. 35 and the accompanying Attachment 1, both indicated they included the work in the "construction drawings and specifications prepared by Olin Partnership (DWG. #087/41032)." What this "DWG #087/41032" refers to has always been a mystery. As of December 5, 2003, the latest set of drawings and specifications which had been issued by Olin Partnership were dated November 25, 2003 and indicated they were "NOT FOR CONSTRUCTION". The mutuality of this mistaken understanding is confirmed by the Contracting Officer's Final Decision, which alleges: "It was agreed among the parties that a 100-percent Final CDs set of drawings was not going to be required in order to save time and expense." There was no such agreement among the parties and the Park Service did, in fact, require the preparation of a Final CDs set of drawings. The appeal in case number 1:07-cv-00281-CFL relates to the unpaid balance due for the performance of this work.

25. The November 25, 2003 specifications also contained the same Section 02920 (copy attached to the Certified Claim as **EXHIBIT 8**) which set forth the requirements for "Soil Preparation," including the requirements for various topsoil mixes to be utilized in different locations around the project site. In this regard, at the time the November 25, 2003 specifications were issued, the Olin Partnership was unaware of the discussions between Grunley-Walsh and the Park Service concerning Cherry Hill's alternative top soil approach.

**The Top Soil Change Work Required**

26. Despite the understanding between Grunley-Walsh and the Denver office of the Park Service concerning the alternative top soil approach, as work on the Project proceeded and it became time to begin the top soil operation, it became apparent the local Park Service representatives were uninformed about the pre-award discussions concerning the topsoil alternative to be provided by Cherry Hill. However, the local Park Service representatives did recognize the top soil sand content contemplated by the specifications was excessive. This fact is also acknowledged in the Contracting Officer's Final Decision which states, "Once the Government realized that the original specification in the contract was excessive . . . ". As such, the requirements of the specifications were abandoned.

27. In this regard, the Chief Arborist for the local DC Park Service, Rob DeFeo, issued a Memorandum on March 23, 2005 (copy attached to the Certified Claim as **EXHIBIT 9**), setting forth what he believed to be the "Best Practices" for topsoil in the Washington DC region. His Memo indicated that, in top soil for both seed and sodding purposes, the sand mix should be 60% to 65%. Although such a sand mix ratio was less than the specified ratio, it was still a great deal higher than what Grunley-Walsh and Cherry Hill had contemplated at the time the lump sum price for Task Order No. 35 was negotiated.

28. Shortly after receipt of the March 23, 2005 "Best Practices" Memorandum, Grunley-Walsh received an undated letter from the Contracting Officer (copy attached to the Certified Claim as **EXHIBIT 10**). This letter stated, "[t]he Park Service has provided 'Best Practices' for soil preparations that reflect what is in the specification."[1] Although Grunley-Walsh disagreed, it reasonably understood the Park Service was now directing Grunley-Walsh to provide topsoil with a sand mix of 60% to 65%. In addition, the Contracting Officer's letter indicated the top soil was to receive a "soil amendment" (i.e. known as "leaf grow"). These requirements were a contract change and a change from what had been agreed upon at the time the Task Order lump sum amount had been negotiated.

29. Thereafter, at a meeting with the Park Service on March 30, 2005, Grunley-Walsh again reiterated their position that any requirement by the Park Service to provide topsoil different from the topsoil alternative (i.e., the DC DPW Standard of 15% to 50% sand) agreed upon at the time of contracting would be a change for which Grunley-Walsh expected payment. The next day, Grunley-Walsh received an April 1, 2005 self serving letter from Mr. Giller of the Park Service (copy attached to the Certified Claim as **EXHIBIT 11**), which misstated what was discussed at the March 30th meeting. However, the letter again reiterated Grunley-Walsh was to provide topsoil prepared in accordance with the Park Service's "Best Practices." In doing so, the Park Service now stated:

> The 'Best Practices' supersedes the specifications with respect to the proportion of sandy loam and organics. The percentage of sand is reduced.[2]

30. Again, this represented a contract change and a change from what had been agreed upon at the time the Task Order lump sum amount had been negotiated. However, at

---

[1] The Contracting Officer's letter also stated that 6" of topsoil (as opposed to 12") was required per the contract.

least the Park Service recognized the specifications were being abandoned (i.e. "superseded"). Nevertheless, Grunley-Walsh still maintained its position that any requirement by the Park Service to provide top soil different from the agreed upon top soil alternative would be a change for which Grunley-Walsh expected payment.

31. Thereafter, at a jobsite meeting on April 22, 2005, the Park Service continued to dictate changed requirements for preparation of the top soil, including an inefficient procedure for placing the topsoil and ripping the subsoil 16" to 22". A copy of the April 22, 2005 Meeting Minutes is attached to the Certified Claim as **EXHBIT 12**. This was not acceptable to Grunley-Walsh. By letter dated April 25, 2005 (copy attached to the Certified Claim as **EXHIBIT 13**), Grunley-Walsh explained to the Park Service the exact procedure it would perform.

32. On May 2 through 6, 2005, some initial loads of topsoil were delivered to the Project site. Grunley-Walsh had this top soil tested and, by transmittal dated May 13, 2005 (copy attached to the Certified Claim as **EXHIBIT 14**), provided the test results to the Park Service. In doing so, Grunley Walsh noted the top soil satisfied the DC DPW standards for top soil; having a sand content of no more than 50%.

33. By letter dated May 17, 2005 (copy attached to the Certified Claim as **EXHIBIT 15**), the Park Service rejected the top soil; stating "a significant amount of additional sand is necessary to meet the contract required topsoil gradation." Again, Grunley-Walsh disagreed. However, by letter dated May 17, 2005 (copy attached to the Certified Claim as **EXHIBIT 16**), Grunley-Walsh acknowledged that it would proceed in accordance with the Park Service's directives. Thereafter, the Invoice Statements from Campbell Sand & Gravel Company (copies attached to the Certified Claim as **EXHBIT 17**), establish that Grunley-Walsh had over 2,616

---

[2] The Park Service's letter of April 1, 2005 also stated that 6" of topsoil (as opposed to 12") was required per the contract.

tons of sand delivered to the Project site during the period between May 19, 2005 and June 24, 2005.

34. In addition, to comply with the Park Service's directives, Grunley-Walsh was required to purchase 3,500 yards of "leaf grow" (dark brown in appearance) from its Subcontractor, Davey Tree. Then, Grunley-Walsh began the arduous and time consuming process of mixing the sand, the top soil and the leaf grow for spreading and placement prior to sodding. This process as well as the sand and leaf grow are depicted in the pictures below:








Mixing Sand, Leaf Grow and Top Soil




Mixing Sand, Leaf Grow and Top Soil

35. The additional cost to perform the above described change work was $259,863.

36. Pursuant to the Contract's Dispute clause and the Contract Disputes Act, on January 30, 2007, Grunley-Walsh submitted its Certified Claim for the aforementioned change work; requesting a Contracting Officer's Final Decision on the matter.

37. All conditions precedent for the filing of this action have been satisfied, waived and/or excused.

**COUNT I (Equitable Adjustment)**

38. The allegations contained in paragraphs 1 through 37 above are incorporated by reference as through fully set forth herein.

39. In accordance with the Contract Changes clause, the Government is required to provide an equitable adjustment for additional costs caused by any change to the performance of any part of the work. The Government has failed to comply with this Contract clause.

40. As a result of the foregoing and pursuant to the Contract, Grunley-Walsh is entitled to be paid $259,863 for the change work described herein. To date, the cost related to said change work remains unpaid.

41. As such, the Government is liable to Grunley-Walsh for $259,863, plus interest thereon as allowed by the Contract Disputes Act.

**WHEREFORE**, Plaintiff, Grunley-Walsh, LLC, demands judgment against Defendant, The United States of America, for award of damages in the amount of $259,863, plus such other and further relief as this Court deems just and proper, including interest as required by the Contract Disputes Act.

**COUNT II (Reformation)**

41. The allegations contained in paragraphs 1 through 37 above are incorporated by reference as through fully set forth herein.

42. Reformation of the parties' contract is necessary to conform the words of the contract to those the parties' actually intended.

43. In this case, it is a fact that during the summer of 2003 the parties recognized the Design Development Specifications for the top soil work was excessive and cost prohibitive.

44. In this case, it is a fact that in the summer of 2003 the parties discussed and agreed upon an alternative top soil approach which was not as excessive as the top soil specification in the Design Development documents and which cost less to provide.

45. In this case, it is a fact that when the Park Service issued its Request For Proposal on November 24, 2003, it erroneously requested a price proposal that "should be based on the 100% complete specifications and drawings for the referenced project."

46. In this case, it is a fact that, despite the erroneous reference in the Government's Request For Proposal, when the parties negotiated the contract price they understood the contract price included the alternative top soil approach.

47. In this case, it is a fact that when Task Order No. 35 was issued, Paragraph 1.1 of the Project Requirements attached to the Task Order stated, "the work will include all activities contained in the **construction** drawings and specifications prepared by Olin Partnership (DWG. #087/41032)."

48. In this case, it is a fact that as of the December 5, 2003 date for Task Order No. 35 "construction" drawings and specifications had not been prepared by the Olin Partnership.

49. In this case, it is a fact that what "DWG. #087/41032" refers to is unclear and nonexistent.

50. In this case, it is a fact that at the time of the Government's November 24, 2003 Request For Proposal and at the time of the December 5, 2003 Task Order No. 35 issuance, the only drawings and specifications which had been prepared by the Olin Partnership were for design development purposes and clearly indicated they were "**NOT FOR CONSTRUCTION**".

51. In this case, it is a fact that when Task Order No. 35 was issued, it mistakenly failed to specify the alternative top soil approach which the parties had negotiated and agreed upon. As such, Task Order No. 35 did not correctly express the parties' agreement.

52. In this case, it is a fact that Task Order No. 35 mistakenly referred to a top soil specification that had not been issued for construction, that was excessive and that was contrary to the alternative top soil approach for which a price had been submitted and agreed upon by the parties. As such, Task Order No. 35 did not correctly express the parties' agreement.

53. In this case, it is a fact that at the time Grunley-Walsh negotiated and entered into Task Order No. 35 both Grunley-Walsh and the Government reasonably believed the top soil work for the project was to be performed using the alternative approached they had negotiated and discussed with the Government. This was a basic assumption underlying the contract.

54. In this case, it is a fact that the Government subsequently directed a different top soil approach, in accordance with the Park Service's "Best Practices" be utilized. This approach was different than the top soil work contemplated in the Design Development Specifications and was different than the alternative top soil approach Grunley-Walsh had submitted and discussed with the Government.

55. In this case it is a fact, the Government either knew or objectively should have known, based on the facts and circumstances surrounding the transaction that, as written, Task Order No. 35 did not reflect the "meeting of the minds" between the parties concerning the topsoil work to be performed pursuant to Task Order No. 35.

56. The circumstances surrounding the Government's Request for Proposal, the topsoil cost information and topsoil alternative submitted to the Government and the amount included in Grunley-Walsh's price submission to perform the Task Order No. 35 work together with the mistaken reference to "construction" drawings and specifications that were issued "**NOT FOR CONSTRUCTION**" and the Government's acknowledgement the specifications were "excessive" and not what was contemplated, require the contract to be reformed to reflect the actual intention of the parties concerning the topsoil work to be performed.

**WHEREFORE**, Plaintiff, Grunley-Walsh, LLC, demands judgment and/or equitable relief against Defendant, The United States of America, in the form of contract reformation, plus

such other and further relief as this Court deems just and proper, including interest as required by the Contract Disputes Act.

Respectfully submitted,

Roger C. Jones

**HUDDLES, JONES**
**SORTEBERG & DACHILLE, P.C.**
10211 Wincopin Circle, Suite 200
Columbia, Maryland 21044
(301) 621-4120
(301) 621-4473 (fax)
jones@hjpc.com

Counsel for Plaintiff,
Grunley-Walsh, LLC

DATED: June 18, 2007