# ORDER FOR [SU]PPLIES OR SERVICES

PAGE 1 OF 4 PAGES

IMPORTANT: Mark all packages and papers with [con]tract and/or order numbers.

1. DATE OF ORDER: 12/05/2003
2. CONTRACT NO. *(If any)*: C3059980901
3. [OR]DER NO.: [?]3059989135
4. REQUISITION/REFERENCE NO.:
5. ISSUING OFFICE *(Address correspondence to)*
   DSC - CS - Contracting Services Group
   National Park Service, P.O. Box 25287
   12795 W. Alameda Parkway
   Denver CO 80225

6. SHIP TO:
   a. NAME OF CONSIGNEE: No Shipping Information
   b. STREET ADDRESS:
   c. CITY:
   d. STATE:
   e. ZIP CODE:
   f. SHIP VIA:

7. TO:
   a. NAME OF CONTRACTOR:
   b. COMPANY NAME: Grunley-Walsh Construction J.V
   c. STREET ADDRESS: 11910 Parklawn Dr.
   d. CITY: Rockville
   e. STATE: MD
   f. ZIP CODE: 20852

8. TYPE OF ORDER
   - ☐ a. PURCHASE
     REFERENCE YOUR:
     Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated.
   - ☐ b. DELIVERY - Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract.

9. ACCOUNTING AND APPROPRIATION DATA: See Funding Detail

10. REQUISITIONING OFFICE:

11. BUSINESS CLASSIFICATION *(Check appropriate box(es))*
   ☐ a. SMALL ☑ b. OTHER THAN SMALL ☐ c. DISADVANTAGED ☐ d. WOMEN-OWNED

12. F.O.B. POINT: Destination

13. PLACE OF
   a. [INS]PECTION:
   b. ACCEPTANCE:

14. GOVERNMENT B/L NO.:

15. DELIVER TO F.O.B. POINT ON OR BEFORE *(Date)*: 02/28/2005

16. DISCOUNT TERMS
   10 days %
   20 days %
   30 days %
   days %

17. SCHEDULE *(See reverse for Rejections)*

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| | SEE LINE ITEM DETAIL | | | | | |

18. SHIPPING POINT:
19. GROSS SHIPPING WEIGHT:
20. INVOICE NO.:

*SEE BILLING INSTRUCTIONS ON REVERSE*

21. MAIL INVOICE TO: Lori Irish
   a. NAME: DSC - CS - Contracting Services Group
   b. STREET ADDRESS *(or P.O. Box)*: National Park Service, P.O. Box 25287,12795 W. Alameda Parkway, ATTN: Lori Irish
   c. CITY: Denver
   d. STATE: CO
   e. ZIP CODE: 80225

17(h) TOT. *(Cont. pages)*

17(i) GRAND TOTAL: $13,993,216.00

22. UNITED STATES OF AMERICA BY *(Signature)*

23. NAME *(Typed)*: John M. Fox
   TITLE: CONTRACTING/ORDERING OFFICER

## SUPPLEMENTAL INVOICING INFORMATION



If desired, this order (or a copy thereof) may be used by the Contractor as the Contractor's invoice, instead of a separate invoice, provided the following statement, (signed and dated) is on (or attached to) the order: "Payment is requested in the amount of $_______. No other invoice will be submitted." However, if the Contractor wishes to submit an invoice, the following information must be provided; contract number (if any), order number, item number(s), description of supplies or service, sizes, quantities, unit prices, and extended totals. Prepaid shipping costs will be indicated as a separate item on the invoice. Where shipping costs exceed $10 (except for parcel post), the billing must be supported by a bill of lading or receipt. When several orders are invoiced to an ordering activity during the same billing period, consolidated periodic billings are encouraged.

## RECEIVING REPORT

Quantity in the "Quantity Accepted" column on the face of this order has been: ☐ inspected, ☐ accepted, ☐ received by me and conforms to contract. Items listed below have been rejected for the reasons indicated.

| SHIPMENT NUMBER | PARTIAL | | DATE RECEIVED | SIGNATURE OF AUTHORIZED U.S. GOV'T REP. | DATE |
|---|---|---|---|---|---|
| | FINAL | | | | |
| TOTAL CONTAINERS | GROSS WEIGHT | | RECEIVED AT | TITLE | |

## REPORT OF REJECTIONS

| ITEM NO. | SUPPLIES OR SERVICES | UNIT | QUANTITY REJECTED | REASON FOR REJECTION |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## ORDER FOR SUPPLIES OR SERVICES
## SCHEDULE - CONTINUATION

PAGE NO. 3 of 4

**IMPORTANT: Mark all packages and papers with contract and/or order numbers.**

| DATE OF ORDER | CONTRACT NO. | ORDER NO. |
|---|---|---|
| 12/05/2003 | C3059980901 | T3059989135 |

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| 0001 | Washington Monument Physical Security and Grounds, NACC-42400 | 1.00 | job | 13,993,216.000 | 13,993,216.00 | |

Task Order No. 35: Construct and Install Above Ground Security Barrier System, Physical Security System, Washington Monument, Washington DC

The Contractor shall provide all labor and materials necessary to accomplish work contained in the Project Requirements (attachment (1), 12 pages), and Specifications and Drawings prepared under previous Task Order by Olin Partnership (Drawing No. 087/41032), which are incoprorated and become a part of this Task Order.

Construction effort shall be completed in accordance with Attachment (2), Davis Bacon Wage Determination Nos. DC020003 (Building) dated April 4, 2003 and DC20030001 (Heavy/Highway/Sewer and Water Line) dated June 13, 2003, as incorporated in the Base Contract for Option Year V.

Issuance of this Task Order represents Notice to Proceed (NTP) for construction effort. Based on 450-calendar day performance period specified in the Project Requirements, the Task Order completion date is established as FEBRUARY 28, 2003.

POCs:
CO: J. M. Fox, 303/969-2118
CS: L. Irish, 303/969-2362
PM/COR: M. Donnelly, 303/969-2207
Budget: V. Kjekstad, 202/619-7269

*Delivery Date*
02/28/2005

*TOTAL CARRIED FORWARD TO 1ST PAGE (ITEM 17i)* ⇒ $13,993,216.00

| Contract Level Funding Summary | Document Number | Title | Page |
|---|---|---|---|
| | T3059989135 | Sitework Construction | 4 of 4 |

2004 - - - 3400 - - 252Z - - 415 - - - 4480 - - - - - -

$1,797,031.00

2004 - - - 3400 - - 252Z - - 477 - - - 4240 - - - - - -

$11,702,969.00

2004 - - - 3400 - - 252Z - - 477 - - - 4240 - - - - - -

$493,216.00

**Total Funding: $13,993,216.00**

Bilateral Agreement:

Contractor (Grunley-Walsh Joint Venture) agrees to furnish and deliver all items or perform all the services set forth or otherwise identified in Task Order No. T3059989135, issued under Contract No. 1443C3059980901, for Services to Construct and Install an Above Ground Vehicle Security Barrier System for the Washington Monument.

Loren D. Raap, General Manager
Name and Title of Signer

Signature of Authorized Person to sign

December 5, 2003
Date

## PART 1 PROJECT REQUIREMENTS-GENERAL

### 1.1 PROJECT NARRATIVE

A. The National Park Service, Denver Service Center (DSC) will be using a Design Build (DB) contract for the construction activities at the Washington Monument. The work will include all activities contained in the construction drawings and specifications prepared by OLIN Partnership (DWG. #087/41032). Visitor access to the monument shall be maintained during all phases of the work, unless authorized by the contracting officer.

### 1.2 PROJECT DATE

A. The project milestones for submittals, indicated in Paragraph B below, are expressed as a percentage of project time elapsed from the date of Notice to Proceed. Submittals must be 100% complete at the time indicated for submittal.

B. Project Dates

1. 30% submittal requirements (see section 2.5): within 15 days of completed contract negotiation

2. 100% Submittal Requirements (See Section 2.6 ): 450 Calendar days from Original Notice to Proceed.

### 1.3 PROJECT MEETINGS

A. Progress Meetings: The DBC shall schedule one meeting each week during construction to address design and construction issues and shall include the subcontractors and the Contracting Officer and / or Park Representative.

B. The meeting agenda will include the following as a minimum:

Approval of minutes of previous meetings
Review of work progress – provide updated CPM schedule
Field observations, problems, and decisions
Identification of problems that impede planned progress
Review of submittals schedule and status of submittals
Review of off-site fabrication and delivery schedules
Corrective measures to regain projected schedules
Planned progress during succeeding work period
Maintenance of quality and work standards
Effect of proposed changes on progress schedule and coordination
Review of Safety Program

## PART 2 PROJECT REQUIREMENTS – CONSTRUCTION ADMINISTRATION SERVICES

### 2.1 GENERAL REQUIREMENTS FOR SUBMITTAL DOCUMENTS

A. This section addresses the requirements for submittal documents including preparation of, the Project Schedule, and the Accident Prevention Plan.

B. Submittal and Approval Procedures:

1. Submit sufficient information based upon the performance specifications for the Government to make an informed decision on compliance or lack of compliance for the items being reviewed. Submittals shall be transmitted using National Park Service form CM-16. A copy of the form is included at the end of the Project Requirements.

C. General

2. Unless specified elsewhere, include a cover page and table of contents for each document type. The cover page shall include:

   a. Project title Rehabilitation Washington Monument – Upgrade physical security and grounds, NACC – PMIS #042400.

   b. Design Build Contract Number

   c. Design Build DBC's name and address

C. Contracting Officer's Review:

1. Any work done or orders for materials or services placed before approval shall be at the Contractor's own risk.

2. Provide 5 copies of Submittals for review. Each Submittal shall be sent by overnight mail to the Contracting Officer and the park. The names and addresses of recipients to be provided after contract award.

3. The Government (DSC and select park staff) will check submittals for compliance with the RFP. The Government (park and DSC) will provide review comments to the DBC within 10 working days.

4. After reviewing submittals, the Contracting Officer will return one copy of form CM-16 and one copy of applicable (marked up) submittal sheets to the Contractor, by overnight mail. All submitted items will be retained. The DBC is responsible for producing additional copies for his/her own use.

5. The returned submittal will be marked in one of three ways as defined below:

   a. APPROVED: Acceptable with no corrections.

   b. APPROVED WITH NOTATIONS: Minor corrections or clarifications required. All comments are clear and no further review is required. The Contractor shall address all review comments when proceeding with the work.

   c. DISAPPROVED - RESUBMIT: Rejected as not in accordance with the contract or as requiring major corrections or clarifications. The Contracting Officer will identify the reasons for disapproval. The Contractor shall revise and resubmit with changes clearly identified.

6. Manufacturers' Catalog Sheets: Submit only pertinent pages; mark each copy of standard printed data to identify specific products proposed for use.

7. The Contracting Officer reserves the right to require additional submittals.

8. After review, the CO shall notify the DBC of approval, approved with notations, or disapproved - resubmit.

D. Drawings

1. Maintain consistent scale and orientation between various disciplines providing drawings. Prepare all drawings in AutoCAD 2000. Review submittals may be provided on half size sheets, provided they are legible.

2. The DBC shall use NPS-10, *Guidelines for Preparation of Design and Construction Drawings*. Provide at least 1/8-inch height for all symbols, letters (including lower case) and numerals. Provide all letters and numerals adequately spaced in single-stroke upper-case vertical style. All lines, strokes, letters and numerals shall be as uniformly dense as practical. Scale identification shall be by graphic illustration or by appropriate explanation to scale notation. Screening on drawings must be suitable for reduced size reproductions.

3. Project Record Drawings (As-Built): Maintain one complete full-size-set of contract drawings. Clearly mark changes, deletions, and additions using National Park Service drafting standards to show actual construction conditions. Keep record drawings current. Certification of accuracy and completeness will be required on monthly payment requisitions. On completion of the total project, submit complete record drawings. Provide CADD files of record drawings. Include all shop drawings, sketches, and additional drawings that are to be included in the final set, with clear instructions showing the location of these drawings.

2.2 ACCIDENT PREVENTION PLAN

A. Reference Section 2.5.B.

B. Before on-site work contained in Part 3, 3.1-B begins, submit for approval an accident prevention program. The program shall comply with OSHA and project requirements. Include the following: Name of responsible supervisor to carry out the program; monthly safety meetings; first aid procedures; outline of each phase of work, hazards associated with each phase and methods proposed to ensure property protection, and safety of the public. Temporary materials may be new or used, but must be adequate in capacity for the required usage, must not create unsafe conditions, and must not violate requirements of applicable codes and standards.

C. The Washington Monument will remain accessible by visitors at all times during construction, except as indicated in Section 3.3.

2.3 CONSTRUCTION PLAN

A. Reference Section 2.5.C.

B. The completed plan shall identify each major phase of the project, including but not limited to the following:

1. A site plan showing exact locations proposed for trailers, storage, parking, and type of barrier fencing for the DBC's use.

2. Mobilization and access routes to site for equipment, material and workmen. Reference Sections 3.7 and 3.8.

3. Listing of equipment required for each phase of work.

4. Listing of labor required for each phase of work.

2.4 PROJECT SCHEDULE:

A. Reference Section 2.5.D.

B. Project Schedule:

1. The project schedule shall cover the entire contract period. The late finish of the project schedule shall be the same date as the established completion date of the contract. The purpose of the project schedule is to ensure adequate planning, coordination, scheduling, and reporting during execution of construction activities of the DBC.

2. The project Schedule shall be based upon the Critical Path Method (CPM) for planning, scheduling and reporting progress of the work. The software shall be the latest version of SureTrak Project Scheduler, or approved equal.

3. Show anticipated dates for utility connections and disconnects. Show anticipated dates for work that has to be coordinated with the Park.

4. In developing the project schedule, the DBC shall be responsible for ensuring that subcontractor work at all tiers, as well as its own work, is included in the project schedule.

5. The project schedule as developed shall show the sequence and interdependence of activities required for complete performance of the work. The DBC shall be responsible for ensuring all work sequences are logical and the project schedule shows a coordinated plan of the work.

6. Proposed duration assigned to each activity shall be the DBC's best estimate of time required to complete the activity considering the scope and resources planned for the activity.

7. Seasonal weather conditions and permitting shall be considered and included in the planning and scheduling of all work influenced by high or low ambient temperatures, wind and/or precipitation to ensure completion of all work within the contract time.

C. Project Schedule Updates

1. General: The project schedule shall be updated monthly and submitted with payment request.

2. Progress Payments: The updating of the project schedule shall be an integral part and basic element of the estimate upon which progress payments will be made under this contract. If, in the judgment of the Contracting Officer, the DBC fails or refuses to provide a complete schedule update or revision as specified hereinafter, the DBC shall be deemed to have not provided the required estimate upon which the progress payment may be made, and shall be subject to retainage of a portion of the payment.

D. Time Impact Analysis For Contract Modifications, Changes, Delays, and DBC Requests

1. Requirements: When contract modifications or changes are initiated, delays are experienced, or the DBC desires to revise the project schedule, the DBC shall submit to the Contracting Officer a written time impact analysis illustrating the influence of each modification, change, delay, or DBC request on the contract time.

2. Time Extensions: Activity delays shall not automatically mean that an extension of the contract time is warranted or due the DBC. It is possible that a modification, change, or delay will not affect existing critical activities or cause non-critical activities to become critical. A modification, change, or delay may result in only absorbing a part of the available total float that may exist within an activity chain of the project schedule, thereby not causing any effect on the contract time. Time extensions will be granted in accordance with the terms of the contract.

3. Float: Float is not for the exclusive use or benefit of either the Government or the DBC. Extension of the contract time will be granted only to the extent the equitable time adjustments to the activity or activities affected by the modification, change, or delay exceeds the total (positive or zero) float of a critical activity (or path) and extends the contract completion date.

2.5 30% SUBMITTAL REQUIREMENTS

A. Accident Prevention Plan: Provide a hard copy of the completed plan. This plan should include drawings to identify public protection and worker protection measures. Reference Section 2.2.

B. Construction Plan: Provide hard copies of the completed plan. Reference Section 2.3. This plan should include at a minimum those items listed above.

C. Project Schedule: Provide hard copies of the completed Project Schedule as indicated in this document. Reference Section 2.4.

2.6 100% SUBMITTAL REQUIREMENTS

A. As-built modifications shall be made to the drawings provided. If paper copies are modified use legible printed lettering for notes. All electronic drawings generated as submittals shall be modified with As-built modifications using AutoCAD. Provide electronic copy of all AutoCAD generated drawings

## PART 3 PROJECT REQUIREMENTS AND SAFETY AND SECURITY SERVICES AND CONSTRUCTION SERVICES

3.1 Accomplish project as described below and as described in the construction drawings and specifications – Project No: PMIS 04200

A. SAFETY AND SECURITY SERVICES

1. Provide, as needed and as directed by the contracting officer, adjustments to the perimeter security fence or the visitor access safety fence.

2. Fabricate and install, as directed by the contracting officer, a maximum of 32 visitor safety/security signs on the perimeter of the Washington Monument Grounds.

3. Institute and maintain a security system that includes at a minimum; personnel security identification with the incumbent security clearances as defined by the USPP; on site security of the entrance and egress points with vehicle denial systems, as directed by the USPP.

4. Removal of the existing jersey barrier system to a site not more than 15 miles from the Monument, as directed by the contracting officer.

5. Development and installation of a security bollard system that is compatible with similar systems employed by the National Park Service in the Washington Metropolitan Area.

B. CONSTRUCTION SERVICES

1. Construct all elements contained in drawings and specifications, identified as NPS DWG #807-41032.

## 3.2 WORKING HOUR AND DATE RESTRICTIONS

A. The Memorial is opened to the public from 8:00 AM to midnight, 7 days per week, year round.

B. All construction activities shall take place between 6:30 AM and 3:30 PM. Construction and repair activities outside the hours of 6:30 AM to 3:30 PM must receive prior approval from the Contracting Officer.

C. No work shall occur on all Federal Holidays. Expect significant delays during the Cherry Blossom Festival (last week in March – first week in April), and the (2) weeks surrounding the 4th of July.

D. Truck traffic to the truck deliveries, removal of materials and supplies and heavy equipment arrivals and departure is not restricted to specific hours, provided no delays to traffic.

E. The National Park Service may schedule special activities at the memorial that require the contractor to suspend work activities. DBC will receive written notice 48 hours in advance of suspension of work from the Contracting Officer.

## 3.3 PUBLIC ACCESS TO PREMISES

A. The Washington Monument will remain open and unobstructed at all times during construction. Temporary barriers and protection shall be outlined in the Accident Prevention Plan, see Section 2.5.

B. The Contracting Officer may approve temporary or long term closures. Requests for temporary closures shall be received in writing 48 hours in advance of closure times requested.

## 3.4 PROTECTION OF PUBLIC

A. It shall be the DBC's responsibility to protect the public from any and all hazards due to the work. This shall include the erection of fences, barricades, and other warning and safety devices where necessary to ensure the public safety. Protection measures shall be outlined in the Accident Prevention Plan.

B. Erect and maintain barricades, lights, danger signals, and warning signs in accordance with MUTCD-1988.

C. Illuminate barricades and obstructions at night; keep safety lights burning from sunset to sunrise.

D. Cover pipes, hoses, and power lines crossing sidewalks and walkways.

E. Install barriers tapes where directed by the Contacting Officer and keep a minimum to two rolls on site at all times.

3.5 ACCIDENT PREVENTION

A. Accident Reporting: Reportable accidents, defined as death, occupational disease, traumatic injury to employees or the public, property damage by accident in excess of $100 and fires, must be reported within seven days. Complete form DI-134 and forward to the Contracting Officer.

B. Quality Assurance: Ensure that all employees are physically qualified to perform their assigned duties in a safe manner. Do not allow employees to work whose ability or alertness is impaired. Operators of all equipment shall be able to understand signs, signals and operating instructions, and be capable of operating such equipment.

C. Accident Prevention Products: Provide the following:

1. First aid facilities.
2. Personnel protective equipment: Meet requirements of NIOSH and MSHA.
3. Emergency instructions, including telephone numbers and reporting instruction for ambulance, physician, hospital, fire department and park police. Place in conspicuous locations at the work site.
4. Adequate egress at all times in accordance with the Life Safety Code (NFPA 101-00).
5. Hard hats for all employees and for up to 6 visitors. Designate and sign all hard hat area s.
6. Training: for first aid and hazardous material handling and storage.

D. Work Stoppages: The DBC shall plan, schedule, and execute the work to prevent stoppages at one area from stopping all work at the construction site.

3.6 LIMITATIONS TO USE OF PREMISES

A. DBC Parking: The DBC shall be permitted to park vehicles inside the Contractor Staging Area fencing and nowhere else on site.

3.7 DESIGN-BUILD CONTRACTORS USE OF PREMISES AND ACCESS

A. Smoking within the work area is not allowed. Smoking is only permitted in the contractors Staging Area.

B. Construction mobilization shall occur in the contractor staging area. Confine storage of materials to areas shown on approved plans.

C. No penetrations of existing architectural fabric will be allowed except where shown on the drawings. Provide temporary protection for any existing architectural fabric affected by construction to eliminate any chance of damage to existing structure. Should damage occur,

repair to the satisfaction of the Contracting Officer and at no additional expense to the Government.

D. The DBC may provide an office for his own use. Size, location, and construction shall be shown on the Construction Plan at 30% submittals.

E. Construction access rules listed below will apply seven days per week as follows:

1. Site access for delivery and hauling shall be shown on a drawing in the DBC's Construction Plan submittal at 30%.

3.8 HAULING RESTRICTIONS AND CONSTRUCTION VEHICLE INSPECTION

A. Comply with all legal load restrictions in the hauling of materials to and from the site. Load restrictions on park roads are identical to the District of Columbia load restriction with such additional regulations as may be imposed the Park Superintendent.

B. Information regarding rules and regulations for vehicular traffic on park roads may be obtained from the office of the Park Superintendent. A special permit will not relieve DBC of liability for damage that may result from moving equipment.

3.9 TEMPORARY SERVICES

A. Sanitary Facilities: Provide sufficiently lighted and ventilated toilet facilities in weatherproof, sight proof, and sturdy enclosures. Provide separate facilities for men and women. Place in approved locations secluded from public observation and convenient to work stations. Maintain and clean toilet facilities at least weekly. Completely remove sanitary facilities when work is completed.

B. Water: Furnish cool, potable water for construction personnel in locations convenient to work.

C. Fire Protection Equipment:

1. Extinguisher: UL Class 2A, 2-1/2-gallon water type, stored-pressure extinguisher and UL Class 10, Type I, 15-pound B:C carbon dioxide extinguisher.

2. Vehicles and Equipment: Provide one extinguisher on each vehicle or piece of equipment.

3. A capable and qualified person shall be placed in charge of fire protection. The responsibilities shall include locating and maintaining fire protective equipment and establishing and maintaining safe torch cutting and welding procedures.

4. Hazard Control: Take all necessary precautions to prevent fire during construction. Do not store flammable or combustible liquids in existing structures. Provide adequate ventilation during use of volatile or noxious substances.

5. Spark Arresters: Equip all gasoline or diesel powered equipment used in potential forest or grass fire locations with spark arresters approved by the U. S. Forest Service. Written determinations of areas and periods of potential fire hazard will be issued by Contracting Officer.

6. Locate internal combustion equipment so that exhausts discharge well away from combustible materials.

7. Smoking: Smoking within buildings or temporary storage sheds is prohibited.

8. Welding: Cutting by torch or welding shall be performed only when adequate fire protection is provided.

D. Electricity And Lighting:

1. Provide temporary lighting and power service for site and construction field office to serve construction trades for duration of construction. Provide connections from existing facilities, sized to provide service required.

2. Conform to requirements of NFPA 70-1996 (NEC) Article 305. If DBC elects to provide ground fault protection through the assured equipment grounding conductor program, DBC shall promptly submit the results of all required tests to the Contracting Officer.

3. Provide PVC flexible conduit, at grade, for electrical cables serving temporary and construction trailers. Construct in such a manner so as not to be a barrier to the disabled. Meet any ADA requirements for thresholds.

4. Protect power lines crossing sidewalks and walkways with commercial conduit troughs in plastic or metal to protect wires on sidewalks and roadways. Construct in such a manner so as not to be a barrier to the disabled. Meet any ADA requirements for thresholds.

5. Provide sufficient lighting levels as required to suit particular locations and operations.

E. Heating And Ventilating:

1. Provide temporary ventilation for comfort and protection of workers, and for proper curing of installed materials.

2. Provide temporary heat as necessary to ensure suitable working conditions for construction operations, and as necessary for storage of products and materials.

3. Do not permit temperature to reach a level that will cause damage to work.

F. Telephone:

1. No telephone line is available on site for DBC use.

2. Provide protection for lines as indicated in D.4.of this section.

3. For hook-up, make arrangements with Telephone Company and pay the costs.

G. Water:

1. Arrange with the park and Contracting Officer for potable water and pay all costs. Make connections to existing facilities as approved by the Contracting Officer. Furnish cool, potable water for construction personnel in locations convenient to work stations.

3.10 EXISTING UTILITIES

A. DBC shall be responsible for locating all existing utilities and coordinating with utility companies.

B. Interruption Of Existing Utility Service: Notify Contracting Officer in writing at least 72 hours in advance of any shutdown of existing utility systems. The time of day for the shutdown shall be at the discretion of the Contracting Officer. Such shutdowns shall be planned and scheduled such that the period of time during which any existing building in the area is without utility service is minimized (4 hours maximum). Interruptions of existing utility service shall be minimized and anticipated shutdowns should be noted in the Construction Schedule.

C. Damage: The DBC shall be responsible for locating and preventing damage to known utilities. If damage occurs, contact the utility company and the contracting officer regarding damage to lines and equipment; repair utility no additional expense to the Government.

3.11 PROJECT CONDITIONS

A. Establish or locate an existing benchmark. Use only benchmarks approved by the Contracting Officer, as basis of measurements.

3.12 PROTECTION OF HISTORIC FABRIC

A. The structure associate in the work of this Contract is listed on the National Register of Historic Places and is a National Historic Landmark. All necessary precautions shall be taken to prevent damage to the structure.

B. Any materials removed from the Monument shall not be sold to the public.

C. Provide temporary barriers and protective covering, as required, or as directed by the Contracting Officer to provide adequate protection to the monument. Do not fasten ropes, guys or cables to the existing features.

3.13 TEMPORARY CONTROLS

A. Housekeeping: Keep project neat, orderly, and in a safe condition at all times. Keep work areas and staging areas clean of all construction debris as the work progresses and clean again at the end of each workday. Dispose of trash in containers located in the Staging Area or off-site.

B. Noise Abatement: Comply with local noise abatement ordinances. Excessively noisy portable radios and other equipment shall not be operated. Equip internal combustion engines and compressors with mufflers and reduce noise. Radios and other similar devices may not be played in the work or staging areas.

C. Dust Control: Minimize airborne dust during construction operations.

D. Snow and Ice Control:

1. Keep access to work areas, including parking areas, clear of snow and ice while work is in progress.

2. Take precautions against damage to materials stored and work installed in freezing weather.

3.14 CONSTRUCTION INSPECTION

A. Construction Inspection Reports: The DBC shall prepare weekly inspection reports and shall transmit them via e-mail to the COR and the park on a monthly basis (to be included with Request for Payment and kept on file in the job trailer). The weekly field report is to state in

general and abbreviated terms, the amounts and types of work completed through the end of the report week for each project, number of modifications and cost of each, number of modifications pending with an estimate of cost, percentage of the contract completed, contract time used, and any difficulties with the construction.

B. Conference Calls: The DBC shall participate in telephone conference calls with the COR and other parties as necessary. The purpose of these calls is to update the COR and other project team members on the work progress, address outstanding project issues and coordinate upcoming work activities.

C. Daily Construction Reports: The DBC shall prepare daily reports, checking for accuracy and completeness. These will be kept on file at the job trailer. At the end of each week send all daily reports and testing reports via email to the COR. A copy of the daily report form is included at the end of the Project Requirements.

D. Photographs: Take photographs documenting construction progress and problems, such as capturing items that will not be seen later, etc. Send the COR a minimum of 10 digital photographs on a weekly basis of each work activity via e-mail in an approved format.

E. Construction Administration

1. DBC will assist NPS in evaluation and review of construction work to review test panels, mock-ups, necessary submissions, application procedures, and work progress in sufficient detail to determine compliance with items outlined by DBC .

2. DBC will document the contractor's procedures in a daily field report for those days that DBC is on site.

3.15 SITE RESTORATION AND CLEANING

A. Remove fencing and trailers. Remove all tools, equipment, surplus materials, and rubbish. Sweep paved areas; rake area around Staging Area. Sod or re-seed grass areas disturbed or damaged by staging area.

3.16 PROJECT CLOSE-OUT

A. Project Record Drawings: Maintain one complete full-size set of drawings Clearly mark changes, deletions, and additions using National Park Service drafting standards to show actual construction conditions. Keep record drawings current. Certification of accuracy and completeness will be required on monthly payment requisitions. On completion of the total project, submit complete record drawings. Include all shop drawings, sketches, and additional drawings that are to be included in a final set.

B. Substantial Completion and Final Inspection: Submit written certification that project, or designated portion of project, is substantially complete, and request in writing a final inspection. The Contracting Officer will make an inspection within 10 days of receipt of request. When work is determined to be substantially complete, the Contracting Officer will prepare a list of deficiencies ("Punch List") to be corrected before final acceptance. The Contracting Officer will issue a Letter of Substantial Completion. If work is not determined to be substantially complete, the Contracting Officer will notify the DBC in writing. After completing work, the DBC shall resubmit certification and request a new final inspection.

C. Acceptance of the Work: After all deficiencies have been corrected, the Contracting Officer will issue a Letter of Acceptance.

--- END OF PROJECT REQUIREMENTS ---

GENERAL DECISION: DC20030001 DC1

Date: June 13, 2003
General Decision Number: DC20030001

Superseded General Decision No. DC020001

State: WASHINGTON,D.C.

Construction Type:
HEAVY
HIGHWAY
SEWER AND WATER LINE

County(ies):
WASHINGTON, D.C.

HEAVY CONSTRUCTION PROJECTS (Including Sewer and Water Lines);
HIGHWAY CONSTRUCTION PROJECTS

| Modification Number | Publication Date |
|---|---|
| 0 | 06/13/2003 |

COUNTY(ies):
WASHINGTON, D.C.

ASBE0024A 03/01/2003

| | Rates | Fringes |
|---|---|---|
| ASBESTOS WORKERS/HEAT AND FROST INSULATORS Includes application of all insulating materials, protective coverings, coatings and finishes to all types of mechanical systems. Also the application of firestopping material for wall openings and penetrations in walls, floors, ceilings and curtain walls. | 23.35 | 10.35 |

----------------------------------------------------------------

ASBE0024B 03/01/2003

| | Rates | Fringes |
|---|---|---|
| HAZARDOUS MATERIAL HANDLER Includes preparation, wetting, stripping, removal, scrapping, vacuuming, bagging and disposing of all insulation materials, whether they contain asbestos or not, from mechanical systems. | 12.37 | 3.91 |

----------------------------------------------------------------

BOIL0193A 10/01/2001

| | Rates | Fringes |
|---|---|---|
| BOILERMAKERS | 25.57 | 12.76 |

----------------------------------------------------------------

BRDC0001A 04/28/2002

| | Rates | Fringes |
|---|---|---|
| BRICKLAYERS | 23.75 | 5.37 |

---

CARP0132A 05/01/2002

| | Rates | Fringes |
|---|---|---|
| CARPENTERS & LATHERS | 21.57 | 3.76 |
| PILEDRIVERS | 19.95 | 4.50 |

---

CARP0132E 05/01/1999

| | Rates | Fringes |
|---|---|---|
| DIVERS | 27.07 | 3.95 |
| DIVER TENDERS | 21.10 | 3.95 |

---

CARP1831A 09/07/1998

| | Rates | Fringes |
|---|---|---|
| MILLWRIGHTS | 20.07 | 3.69 |

---

ELEC0026A 11/04/2002

| | Rates | Fringes |
|---|---|---|
| ELECTRICIANS | 28.35 | 7.77 + 3% |

---

ELEC0026H 07/01/1995

| | Rates | Fringes |
|---|---|---|
| MOTOR REPAIRMEN | | |
| Removal and reinstallation of electrical motors | 19.93 | 2.85+3%+a |

a. PAID HOLIDAYS: New Year's Day, Martin Luther King's Birthday, Inauguration Day, Washington's Birthday, Memorial Day, Fourth of July, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, the day after Thanksgiving, and Christmas Day, or days designated as legal holidays by the Federal Government.

---

ELEC0070B 03/31/2002

| | Rates | Fringes |
|---|---|---|
| LINE CONSTRUCTION: | | |
| Linemen, Cable Splicers, Equipment Operators | 24.48 | 2.45+17.5% |
| Truck with winch | 14.50 | 2.45+17.5% |
| Groundmen | 13.99 | 2.45+17.5% |

---

ENGI0077A 05/01/2002

| | Rates | Fringes |
|---|---|---|
| POWER EQUIPMENT OPERATORS | | |

(HEAVY AND HIGHWAY CONSTRUCTION):

| | | |
|---|---|---|
| GROUP 1 | 23.29 | 4.77+a+b |
| GROUP 2 | 22.83 | 4.77+a+b |
| GROUP 3 | 22.12 | 4.77+a |
| GROUP 4 | 20.54 | 4.77+a |
| GROUP 5 | 16.00 | 4.77+a |
| GROUP 6 | 24.66 | 4.77+a |

POWER EQUIPMENT OPERATORS CLASSIFICATIONS

GROUP 1: 35 ton cranes & above, tower & climbing cranes, derricks, concrete boom pump, drill rigs (equivalent to L & Double L), mole.
GROUP 2: Backhoes, cableways, cranes, cherry pickers, elevating graders, hoists, paving mixers, power shovels, tunnel shovels, batch plants, shields, tunnel mining machines,

gradalls, front end loaders, 3 1/2 cu. yds. and above, power driven wheel scoops and scrapers (50 cu. yds. struck capacity or above), rail tamper, draglines, boomcat, mucking machines, graders in tunnels, pile driving engines.
GROUP 3: Front end loaders below 3 1/2 cu. yds, boom trucks, hydraulic backhoes 1/2 yds. capacity or below rubber or track mounted, tug boats, power driven wheel scoops and scrapers, blade graders, motor graders, bulldozers, trenching machines, concrete mixer, speed swing pettibone, ballast regulator, concrete pump, mechanic, welder, mechanic welder, shotcrete machines, Hoeram, locomotive (standard, narrow gauge), tuggers.
GROUP 4: High lifts above 10 feet, boilers (skelton), asphalt spreaders, bullfloat finishing machines, concrete finishing machines, concrete spreaders, fine graders, air compressors, welding machines, pumps, generators, well points, deep wells, hydraulic pumps, elevators, freeze units, tunnel motorman or dinky operator, roller, conveyors, well drilling machines, grout pump, fireman.
GROUP 5: Fork lifts, ditch witch, bobcat 1/3 cu. yd. and below, space heaters, sweepers, assistant engineers, oilers.
GROUP 6: Master mechanic.

a. PAID HOLIDAYS: New Year's Day, Inaugural Day, Decoration Day, Independence Day, Labor Day, Martin Luther King's Birthday, Veterans' Day, Thanksgiving Day, Friday after Thanksgiving, and Christmas Day.
b. PREMIUM PAY: Tower cranes and cranes 100-ton and over to receive $1.00 per hour premium over Group One.

----------------------------------------------------------------

ENGI0077B 06/01/2002

| | Rates | Fringes |
|---|---|---|
| POWER EQUIPMENT OPERATORS (PAVING AND INCIDENTAL GRADING): | | |
| GROUP 1 | 18.80 | 4.05 |

| | | |
|---|---|---|
| GROUP 2 | 16.70 | 4.05 |
| GROUP 3 | 15.65 | 4.05 |
| GROUP 4 | 14.60 | 4.05 |
| GROUP 5 | 13.55 | 4.05 |
| GROUP 6 | 18.80 | 3.80 |

POWER EQUIPMENT OPERATORS CLASSIFICATIONS

GROUP 1: Gradall operator, Crane.
GROUP 2: Boom Truck, Milling Machine, Excavator, Rubber Tire Backhoe, Asphalt Paver, Asphalt Plant Engineer.
GROUP 3: Motor Grader, Track Loader, Rubber Tire Loader, Track Dozer, Concrete Paver.
GROUP 4: Broom Truck, Asphalt Roller.
GROUP 5: Air Compressor, Grade Rollers.
GROUP 6: Mechanic.

----------------------------------------------------------------

ENGI0077C 07/01/2001

| | Rates | Fringes |
|---|---|---|
| POWER EQUIPMENT OPERATORS (SEWER, GAS AND WATER LINE CONSTRUCTION): | | |
| GROUP 1 | 17.48 | 3.22+a |
| GROUP 2 | 17.08 | 3.22+a |
| GROUP 3 | 16.93 | 3.22+a |
| GROUP 4 | 16.85 | 3.22+a |
| GROUP 5 | 16.74 | 3.22+a |
| GROUP 6 | 16.57 | 3.22+a |
| GROUP 7 | 16.67 | 3.22+a |
| GROUP 8 | 16.57 | 3.22+a |
| GROUP 9 | 17.11 | 3.22+a |
| GROUP 10 | 16.46 | 3.22+a |
| GROUP 11 | 16.34 | 3.22+a |
| GROUP 12 | 16.25 | 3.22+a |

POWER EQUIPMENT OPERATORS CLASSIFICATIONS

GROUP 1: Backhoes, Cableways, Cranes, Derricks, Draglines, Power Shovels, Tunnel Shovels, Tunnel Mucking Machines (1 cubic yard capacity or above).
GROUP 2: Backhoes, Boom Cats, Cableways, Cranes, Derricks, Draglines, Elevating Graders, Hoists, Paving Mixers, Pile Driving Engines, Power and Tunnel Shovels, Tunnel Mucking Machines, Batch Plant, Concrete Pumps.
GROUP 3: Operators of Hydraulic Backhoes of below 1/2 yard capacity.
GROUP 4: Trenching machines (above 83")
GROUP 5: Trenching machines (up to and including 83"), Boilers (Skelton), Well Drilling Machines.
GROUP 6: Air Compressors (Tunnel).
GROUP 7: Front-end Loaders (Hi-Lift) and Bulldozers on Sewer and Water Line Work.
GROUP 8: Concrete Mixers, Power Driven Wheel Scoops and Scrapers, Blade graders, Motor Graders, Tunnel

Mechanics, Tunnel Motormen.
GROUP 9: Mechanics.
GROUP 10: Bulldozers, Hydraulic Tamper and Hoe Pack Operators.
GROUP 11: Rollers.
GROUP 12: Air Compressors, Pumps, Welding Machines, Well Points.

a. PAID HOLIDAYS: New Year's Day, Inaugural Day, Washington's Birthday, Decoration Day, Independence Day, Labor Day, Veterans Day, Thanksgiving Day, Christmas Day and Martin Luther King's Birthday.

---

IRON0005A 06/01/2002

| | Rates | Fringes |
|---|---|---|
| IRONWORKERS: | | |
| Structural, Ornamental and Chain Link Fence | 23.23 | 8.605 |

---

IRON0201A 05/01/2002

| | Rates | Fringes |
|---|---|---|
| IRONWORKERS: | | |
| Reinforcing | 22.15 | 9.05 |

---

LABO0074B 06/01/2002

| | Rates | Fringes |
|---|---|---|
| LABORERS, HAZARDOUS WASTE REMOVAL, (EXCEPT ON MECHANICAL SYSTEMS): Preparation for, removing and encapsulation of hazardous materials from non-mechanical systems | | |
| Skilled Asbestos Abatement Laborers | 14.62 | 2.95 |
| Skilled Toxic and Hazardous Waste Removal Laborers | 16.87 | 2.95 |

---

LABO0456D 06/01/2002

| | Rates | Fringes |
|---|---|---|
| LABORERS, PAVING & INCIDENTAL GRADING: | | |
| Sand Setter, Form Setter | 15.28 | 3.80 |
| Asphalt Raker, Concrete Saw Operator | 14.74 | 3.80 |
| Jack Hammer | 14.65 | 3.80 |
| Asphalt Tammer, Concrete Shoveler | 14.48 | 3.80 |
| Asphalt Shoveler | 14.28 | 3.80 |
| Laborer | 14.17 | 3.80 |

---

LABO0456E 06/01/2002

| | Rates | Fringes |
|---|---|---|

LABORERS, TUNNEL, RAISE, & SHAFT (FREE AIR)
(FOR HEAVY AND SEWER & WATER LINES CONSTRUCTION)

| | | |
|---|---|---|
| GROUP 1 | 17.90 | 2.95 |
| GROUP 2 | 18.39 | 2.95 |
| GROUP 3 | 19.67 | 2.95 |
| GROUP 4 | 20.18 | 2.95 |

LABORERS CLASSIFICATIONS

GROUP 1: Brakeman, Bull Gang, Dumper, Trackman, Concrete Man.

GROUP 2: Chuck Tender, Powdermen in Prime House, Form Setters and Movers, Nippers, Cableman, Houseman, Groutman, Bell or Signalman, Top or Bottom Vibrator Operator.
GROUP 3: Miners, Re-Bar Underground, Concrete or Gunnite Nozzlemen, Powdermen, Timbermen and Re-Timbermen, Wood Steel Including Liner Plate or any Other Support, Material, Motorman, Caulkers, Diamond Drill Operators, Riggers, Cement Finishers - Underground, Welders and Burners, Shield Driver, Air Trac Operator, Shotcrete Nozzleman and Potman.
GROUP 4: Mucking Machine Operator (Air).

----------------------------------------------------------------

LABO0456F 06/01/2002

LABORERS (HEAVY AND HIGHWAY AND SEWER & WATER LINES CONSTRUCTION)

| | Rates | Fringes |
|---|---|---|
| GROUP 1 | 17.35 | 2.95 |
| GROUP 2 | 17.59 | 2.95 |
| GROUP 3 | 17.72 | 2.95 |
| GROUP 4 | 17.83 | 2.95 |
| GROUP 5 | 18.18 | 2.95 |
| GROUP 6 | 18.60 | 2.95 |
| GROUP 7 | 18.82 | 2.95 |
| GROUP 8 | 19.57 | 2.95 |

LABORERS CLASSIFICATIONS

GROUP 1: Carloaders, choker setter, concrete crewman, crushed feeder, demolition laborers, including salvaging all material, loading, cleaning up, wrecking, dumpmen, flagmen, fence erector and installer, including installation and erection of fence, guard rails, median rails, reference posts, guide posts and right-of-way markers, form strippers, general laborers, railroad track laborers, riprap man, scale man, stake jumper, structure mover, includes foundation, separation, preparation, cribbing, shoring, jacking and unloading of structures, water nozzleman, timber bucker and faller, truck loader, water boys, tool room men.
GROUP 2: Combined air and water nozzleman, cement handler, dope pot fireman (nonmechanical), form cleaning machine, mechanical railroad equipment (includes spiker, puller, tie cleaner, tamper, pipe wrapper, power driven wheelbarrows, operators of hand derricks, towmasters,

scootcretes, buggymobiles and similar equipment), tamper or rammer operator, trestle scaffold builders over one tier high, power tool operator (gas, electric or pneumatic), sandblast or gunnite tailhose man, scaffold erector, (steel or wood), vibrator operator up to 4 feet) asphalt cutter, mortar men, shorer and lagger, creosote material handler, corrosive enamel or equl, paver breaker and jackhammer operators.
GROUP 3: Multi-section pipe layer, non-metallic clay and

concrete pipe layer (including caulker, collarman, jointer, rigger and jacker, thermit welder and corrugated metal culvert pipe layer.
GROUP 4: Asphalt block pneumatic cutter, asphalt roller, walker chainsaw operator with attachment, concrete saw (walking), high scalers, jackhammer operator (using over 6 feet of steel), vibrator operator (6 feet and over), well point installer, air trac operator.
GROUP 5: Asphalt screeder, big drills, cut of the hole drills, (1 1/2" piston or larger), down the hole drills (3 1/2" piston or larger), gunnite or sandblaster nozzleman, asphalt raker, asphalt tamper, form setter, demolition torch operator, shotcrete nozzlemen and potman.
GROUP 6: Powderman, master form setters.
GROUP 7: Brick paver (asphalt block paver, asphalt block sawman, asphalt block grinder; hastings block or similar type)
GROUP 8: Licensed powdermen.

----------------------------------------------------------------

LABO0456G 06/01/2002

LABORERS, TUNNEL, RAISE, AND SHAFT (COMPRESSED AIR) FOR HEAVY CONSTRUCTION ONLY:

| Gauge Pressure (Pounds) | Work Period (Hours) | Rates | Fringes |
|---|---|---|---|
| 1-14 | 7 | 21.56 | 2.95 |
| 14-18 | 6 | 25.46 | 2.95 |

On any requirement for air pressure in excess of 18 PSI, work periods and rates should be negotiated at a pre-bid conference.

----------------------------------------------------------------

LABO0456H 06/01/2002

LABORERS, BRICK MASONRY WORK:

| | Rates | Fringes |
|---|---|---|
| Mason Tenders | 13.28 | 2.95 |
| Scaffold Builders, Mortarmen & Small Equipment Operators | 13.93 | 2.95 |

----------------------------------------------------------------

MARB0002E 05/01/2002

| | Rates | Fringes |
|---|---|---|
| MARBLE & STONE MASONS (Includes Pointing, Caulking and Cleaning of All types of Masonry, Brick, Stone and Cement structures) | 25.92 | 8.55 |

---

MARB0003I 05/01/2002

| | Rates | Fringes |
|---|---|---|
| MOSAIC and TERRAZZO WORKERS, TILE LAYERS | 19.98 | 7.48 |

---

MARB0003O 05/01/2002

| | Rates | Fringes |
|---|---|---|
| MARBLE, TILE and TERRAZZO FINISHERS | 16.42 | 6.52 |

---

PAIN0051A 01/16/2003

| | Rates | Fringes |
|---|---|---|
| PAINTERS: | | |
| All industrial work, industrial lead abatement, abrasive blasting, structural steel, suspended scaffolding and rigging work of any type, application of epoxies, lacquers, and chlorinated rubber base materials, and the application of any industrial special coatings and solvents on any surface | 22.63 | 6.39 |
| New commercial and public construction, repaint, remodeling, lead abatement, spray painters, paperhangers and drywall finishers | 21.21 | 6.39 |

---

PLAS0891A 05/01/2002

| | Rates | Fringes |
|---|---|---|
| CEMENT MASONS (HEAVY CONSTRUCTION ONLY) | 21.87 | 3.895 |

---

PLAS0891B 06/01/2002

| | Rates | Fringes |
|---|---|---|
| CEMENT MASONS, PAVING AND INCIDENTAL GRADING: | | |
| Cement Masons | 15.50 | 3.90 |
| Form Setters | 15.50 | 3.90 |
| Concrete Saw Operators | 15.50 | 3.90 |

---

PLUM0005A 08/01/2002

| | Rates | Fringes |
|---|---|---|
| PLUMBERS | 27.67 | 9.24 |

---

PLUM0602E 08/01/2002

| | Rates | Fringes |
|---|---|---|
| STEAMFITTERS, REFRIGERATION AND AIR CONDITIONING MECHANICS | 27.52 | 9.37+a |

a.PAID HOLIDAYS: New Year's Day, Independence Day, Thanksgiving Day and the day after Thanksgiving, Labor Day and Christmas Day.

---

SHEE0100A 07/01/2002

| | Rates | Fringes |
|---|---|---|
| SHEET METAL WORKERS | 26.88 | 8.06 |

---

TEAM0639C 03/07/2002

| | Rates | Fringes |
|---|---|---|
| TRUCK DRIVERS (HEAVY AND HIGHWAY CONSTRUCTION): | | |
| Tandem & Triaxle (3 or more axles, including steering axle) | 15.00 | 5.02+a |
| Tractor-trailer, Low-boy | 18.00 | 5.02+a |

a. VACATION: Employees will receive one (1) week's paid vacation after one (1) year of service.

---

TEAM0639N 04/01/2002

| | Rates | Fringes |
|---|---|---|
| TRUCK DRIVERS (HEAVY AND HIGHWAY CONSTRUCTION): | | |
| Concrete Mixer Drivers | 15.95 | 5.07+a+b |

a. PAID HOLIDAYS: New Year's Day, Martin Luther King, Jr. Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, Christmas Day, or any day celebrated publicly in the District of Columbia as one of the above holidays.

b. PAID VACATIONS: Employees with one (1) year of service shall be entitled to a vacation of one (1) week; five (3) years of service are entitled to two (2) weeks; fifteen (10) years of service are entitled to three 3 weeks; twenty (20) years of service are entitled to four (4) weeks.

---

TEAM0639O 09/01/2002

| | Rates | Fringes |
|---|---|---|
| TRUCK DRIVERS (PAVING AND | | |

INCIDENTAL GRADING)

| | | |
|---|---|---|
| All paving projects where the grading is incidental to the paving | 13.00 | 3.09 |

----------------------------------------------------------------

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

================================================================

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR 5.5(a)(1)(ii)).

----------------------------------------------------------------

In the listing above, the "SU" designation means that rates listed under that identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a position on a wage determination matter
* a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program. If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed.

With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations. Write to:

Branch of Construction Wage Determinations
Wage and Hour Division
U. S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

2.) If the answer to the question in 1.) is yes, then an interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

Wage and Hour Administrator
U.S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board
U. S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

4.) All decisions by the Administrative Review Board are final.

END OF GENERAL DECISION

GENERAL DECISION DC020003 04/04/2003 DC3

Date: April 4, 2003
General Decision Number DC020003

Superseded General Decision No. DC010003

State: WASHINGTON, D.C.

Construction Type:
BUILDING

County(ies):
WASHINGTON, D.C.

BUILDING CONSTRUCTION PROJECTS (Does not include single family homes and apartments up to and including 4 stories)

| Modification Number | Publication Date |
|---|---|
| 0 | 03/01/2002 |
| 1 | 03/08/2002 |
| 2 | 04/12/2002 |
| 3 | 05/03/2002 |
| 4 | 05/24/2002 |
| 5 | 06/07/2002 |
| 6 | 07/05/2002 |
| 7 | 07/12/2002 |
| 8 | 07/26/2002 |
| 9 | 08/23/2002 |
| 10 | 09/27/2002 |
| 11 | 10/04/2002 |
| 12 | 10/18/2002 |
| 13 | 11/29/2002 |
| 14 | 02/07/2003 |
| 15 | 03/14/2003 |
| 16 | 04/04/2003 |

COUNTY(ies):
WASHINGTON, D.C.

ASBE0024A 03/01/2003

| | Rates | Fringes |
|---|---|---|
| ASBESTOS WORKERS/HEAT AND FROST INSULATORS<br>Includes application of all insulating materials, protective coverings, coatings and finishes to all types of mechanical systems. Also the application of firestopping material for wall openings and penetrations in walls, floors, ceilings and curtain walls. | 23.35 | 10.35 |

----------------------------------------------------------------

ASBE0024B 03/01/2003

| | Rates | Fringes |
|---|---|---|
| HAZARDOUS MATERIAL HANDLER Includes preparation, wetting, stripping, removal, scrapping, vacuuming, bagging and disposing of all insulation materials, whether they contain asbestos or not, from mechanical systems. | 12.37 | 3.91 |

---

BRDC0001A 04/28/2002

| | Rates | Fringes |
|---|---|---|
| BRICKLAYERS | 23.75 | 5.37 |

---

CARP0132L 05/01/2002

| | Rates | Fringes |
|---|---|---|
| CARPENTERS (Including Drywall Hanging) | 21.57 | 3.76 |
| PILEDRIVERS | 19.95 | 4.50 |

---

ELEC0026C 09/02/2002

| | Rates | Fringes |
|---|---|---|
| COMMUNICATION TECHNICIANS | 20.60 | 5.09 |

SCOPE OF WORK:

Includes low voltage construction, installation, maintenance and removal of teledata facilities (voice, data and video) including outside plant, telephone and data inside wire, interconnect, terminal equipment, central offices, PABX, fiber optic cable and equipment, railroad communications, micro waves,

V SAT, bypass, CATV, WAN (Wide area networks), LAN (Local area networks) and ISDN (Integrated systems digital network).

WORK EXCLUDED:

The installation of computer systems in industrial applications such as assembly lines, robotics and computer controller manufacturing systems.
The installation of conduit and/or raceways shall be installed by Inside Wiremen. On sites where there is no Inside Wireman employed, the Teledata Technician may install raceway or conduit not greater than 10 feet.
Fire alarm work is excluded on all new construction sites or wherever the fire alarm system is installed in conduit.
All HVAC control work.

---

ELEC0026T 11/04/2002

| | Rates | Fringes |
|---|---|---|
| ELECTRICIANS (Excluding Communication Low Voltage Wiring) | 28.35 | 7.77 + 3% |

---

* ENGI0077O 05/01/2002

| | Rates | Fringes |
|---|---|---|
| POWER EQUIPMENT OPERATORS | | |
| Cranes (35 tons and over) | 23.29 | 5.12+a+b |
| Cranes (under 35 tons) | 22.83 | 5.12+a |
| Piledrivers | 22.83 | 5.12+a |
| Boom Trucks | 22.12 | 5.12+a |
| Forklifts | 16.00 | 5.12+a |

a. PAID HOLIDAYS: New Year's Day, Inaugural Day, Decoration Day, Independence Day, Labor Day, Martin Luther King's Birthday, Veterans' Day, Thanksgiving Day, Friday after Thanksgiving, and Christmas Day.

b. PREMIUM PAY: Tower cranes and cranes 100-ton and over to receive $1.00 per hour premium over Group One.

---

IRON0005A 06/01/2002

| | Rates | Fringes |
|---|---|---|
| IRONWORKERS: | | |
| Structural, Ornamental and Chain Link Fence | 23.23 | 8.605 |

---

IRON0201C 05/01/2002

| | Rates | Fringes |
|---|---|---|
| IRONWORKERS, REINFORCING | 22.15 | 9.05 |

---

LABO0074A 06/01/2002

| | Rates | Fringes |
|---|---|---|
| LABORERS: | | |
| Skilled Laborers | 16.66 | 2.95 |

SKILLED LABORERS:
Potmen, power tool operator, small machine operator, concrete labor including concrete preparation, signalmen, laser beam operator, waterproofer, open caisson, test pit, underpinning, pier hole and ditches, laggers and all work associated with lagging that is not expressly stated, strippers, operator of hand derricks, vibrator operators, pipelayers, or tile layers, operators of jackhammers, paving breakers, spaders or any machine that does the same general type of work, scaffold builders, operators of towmasters, scootcretes, buggymobiles and other machines of similar character, operators of tampers and rammers, and other machines that do the same general type of work, whether powered by air, electric or gasoline builders of trestle scaffolds over one tier high and sand blasters, power and chain saw operators used in clearing, installers of well points, wagon drill operators, acetylene burners and licensed powdermen.

---

LABO0456S 06/01/2002

| | Rates | Fringes |
|---|---|---|
| LABORERS: | | |
| Mason Tenders, Brick | 13.28 | 2.95 |
| Mortarmen, Scaffold Builders | 13.93 | 2.95 |

---

MARB0002C 05/01/2002

| | Rates | Fringes |
|---|---|---|
| MARBLE & STONE MASONS (INCLUDES pointing, caulking and cleaning of All types of masonry, brick, stone and cement structures; EXCEPT pointing, caulking and cleaning of existing masonry, brick, stone and cement (restoration work)). | 25.92 | 8.55 |

---

MARB0003I 05/01/2002

| | Rates | Fringes |
|---|---|---|
| MOSAIC and TERRAZZO WORKERS, TILE LAYERS | 19.98 | 7.48 |

---

MARB0003O 05/01/2002

| | Rates | Fringes |
|---|---|---|
| MARBLE, TILE and TERRAZZO FINISHERS | 16.42 | 6.52 |

---

PAIN0051D 06/16/2002

| | Rates | Fringes |
|---|---|---|
| GLAZIERS | | |
| Contracts over $2,000,000 | 22.26 | 6.09 |
| Contracts $2,000,000 and under | 21.06 | 6.09 |

---

PAIN0051M 01/16/2003

| | Rates | Fringes |
|---|---|---|
| PAINTERS: | | |
| Brush, Roller, Spray and Drywall Finishers | 21.21 | 6.39 |

---

PLAS0891C 05/01/2002

| | Rates | Fringes |
|---|---|---|
| CEMENT MASONS | 21.87 | 3.895 |

---

PLUM0005I 08/01/2002

| | Rates | Fringes |
|---|---|---|
| PLUMBERS: | | |
| Apartment Buildings over 4 stories (except hotels) | 18.03 | 6.09 |
| ALL Other Work | 27.67 | 9.24 |

---

PLUM0602F 08/01/2002

| | Rates | Fringes |
|---|---|---|
| STEAMFITTERS, REFRIGERATION AND AIR CONDITIONING MECHANICS (Including HVAC Pipe Work) | 27.52 | 9.37+a |

a.PAID HOLIDAYS: New Year's Day, Independence Day, Thanksgiving Day and the day after Thanksgiving Day, Labor Day and Christmas Day.

---

* SFDC0669A 04/01/2003

| | Rates | Fringes |
|---|---|---|
| SPRINKLER FITTERS | 27.60 | 7.10 |

---

SHEE0100B 07/01/2002

| | Rates | Fringes |
|---|---|---|
| SHEET METAL WORKERS (Including HVAC Duct Work) | 26.88 | 8.06 |

---

SUDC1003A 04/12/2000

| | Rates | Fringes |
|---|---|---|
| LABORERS: | | |
| Unskilled | 11.83 | 2.23 |
| POINTERS, CAULKERS, CLEANERS (INCLUDES pointing, caulking and cleaning of existing masonry, brick, stone and cement structures (restoration work); EXCLUDES pointing, caulking and cleaning of new or replacement masonry, brick, stone and cement) | 20.00 | |

---

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

===

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR 5.5(a)(1)(ii)).

---

In the listing above, the "SU" designation means that rates listed under that identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a position on a wage determination matter
* a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program. If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed.

With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations. Write to:

Branch of Construction Wage Determinations
Wage and Hour Division
U. S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

2.) If the answer to the question in 1.) is yes, then an

interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

Wage and Hour Administrator
U.S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board
U. S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

4.) All decisions by the Administrative Review Board are final.

END OF GENERAL DECISION

Grunley-Walsh

5010 Nicholson Lane, Suite 200
Rockville, MD 20852

January 30, 2007

United States Department of
The Interior – NPS
Denver Service Center
12795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287
**ATTN: John M. Fox, Contracting Officer**

**RE: Washington Monument Physical Security System**
**Contract No. 1443CX305998901; Task Order No. 35**

**Subj: Certified Claim/Request For Equitable Adjustment to Contract Amount**
**Top Soil Change Work - $259,863**

**Request For Contracting Officer's Final Decision**

Dear Mr. Fox:

Reference is made to our contract for the above Project as well as to Task Order No. 35. Reference is also made to our prior cost submissions for change work relating to the top soil Grunley-Walsh was required to provide on the Project. The unpaid additional cost to perform this change work totals **$259,863.**

Grunley-Walsh is herewith submitting these unpaid additional costs as a Certified Claim / Request For Equitable Adjustment ("REA") in accordance with the Contract Disputes Clause and the Contract Disputes Act. Attached as **EXHIBIT 1** is a complete itemization as well as supporting cost data for the additional costs requested herein. In submitting these claimed costs, we request a Contracting Officer's Final Decision on this matter within 60 days.

**Entitlement Overview**

On May 6, 1998 Grunley-Walsh was awarded an Indefinite Quantity Contract to stabilize and preserve the Washington Monument (Contract No. C3059980901). Pursuant to Contract Modification No. 0007, dated November 15, 2001, the General Provisions to our original contract were deleted and replaced with revised contract clauses which included certain FAR provisions incorporated by reference. Two of these provisions included the Changes clause (FAR 52.243-04 August 1987) and the Disputes clause (FAR 52.233-01 December 1998).

In accordance with the Contract, on December 5, 2003 Grunley-Walsh was issued Task Order No. T3059989135 (Task Order No. 35) in the amount of $13,993,216. Among other things, Task Order No. 35 required Grunley-Walsh to construct and install an above-ground security barrier system in accordance with certain specifications and drawings prepared under a previous Task Order by the Olin Partnership.[1] This included the construction of elements contained on NPS Drawing No. 807-41032. These drawings included the 90% construction documentation that existed as of November 25, 2003. The drawings also clearly stated they were, "NOT FOR CONSTRUCTION". Likewise, the specifications indicated they were based on the 90% construction documentation that existed as of November 25, 2003 and, they too, clearly stated they were "NOT FOR COSNTRUCTION".

This claim stems from a mutual or, in the alternative, a unilateral mistake at the time Task Order No. 35 was issued. It involves understanding what the parties believed they were agreeing to, with respect to the top soil work, when Task Order No. 35 was awarded for the lump sum negotiated price of $13,993,216. For this reason, it is important to first understand the facts and circumstances leading up to the negotiated price for the Task Order.

[1] The Olin Partnership was Grunley-Walsh's design consultant for the work required in Task Order No. 35.

1. **Pre-Award Facts**

As the Park Service is aware, prior to Task Order No. 35, there were several Task Orders issued to effect the design development for the Project. After various preliminary studies, on April 11, 2002 Task Order No. 28 was issued for preparation/performance of Schematic Design and Design Development Services. In the course of providing these services, price and budget issues were constantly being addressed. It was Grunley-Walsh's understanding this information was necessary for the Park Service to procure funds in order to proceed with the future construction phase of the Project.

Given these circumstances, the starting point begins with the May 16, 2003 issuance of the 100% Design Development drawings and specifications. As these documents were simply for Design Development purposes, they too clearly stated, "NOT FOR CONSTRUCTION." However, based on the issuance of these documents, Grunley-Walsh was able to begin the process of soliciting prices from subcontractors for performance of the construction work. Grunley-Walsh was also able to solicit value engineering suggestions that may help to reduce the cost of construction.

The May 16, 2003 Specifications included Section 02920 (copy attached as **EXHIBIT 2**) which set forth the requirements for "Soil Preparation", including the requirements for various topsoil mixes to be utilized in different locations around the project site. The soil mixes varied based on the amount/percent of "base component material" that was to be utilized in each of the mixes. The specifications also required the base component material to be a mixture of "sand" and "sandy loam" (i.e. a classification of top soil), consisting of 2 parts sandy loam to 5 parts sand (see Specification Section 02920, pages 8-9, in **EXHIBIT 2**). Based on this criteria, the amount of sand to be mixed with organic material was going to be an unusually high percentage. It was also going to add significant cost to the price for the actual landscaping construction work.

This cost concern first became apparent in the summer of 2003 as Grunley-Walsh began receiving preliminary pricing from subcontractors to perform the work. For example, in an August 14, 2003 proposal received from Chapel Valley (attached as **EXHBIT 3**), the proposed cost for the 3 different specified soil mixes ranged from $45 per cubic yard to as high as $65 per cubic yard. To put this cost in perspective, it is important to understand the plan was for each soil mix to be a minimum of 12" deep and the 65 acre site was going to require literally thousands and thousands of cubic yards of soil mix. The cost was expected to be several millions of dollars.

This fact concerning the costs for the soil mixes was communicated to the Park Service (Mike Donnelly) during the summer of 2003. Needless to say, Mr. Donnelly was astonished and he requested suggestions for reducing the price. To quote Mr. Donnelly, "we are the National Park Service; we can grow grass on rocks."

In response to Mr. Donnelly's request, Grunley-Walsh received an October 3, 2003 revised bid/pricing (copy attached as **EXHIBIT 4**) from Cherry Hill Construction, to perform the site work. The base amount of this bid totaled $3,185, 864, and was premised on excluding Specification Section 02920 altogether. Instead, Cherry Hill proposed to provide 6" (as opposed to 12") of off-site top soil (in lieu of the specified soil mixes) that would be in accordance with the District of Columbia DPW Standard Specification for Highways and Structures 1996, Section 822.1 – Topsoil (copy attached as **EXHIBIT 5**) (hereinafter the "top soil alternative"). This top soil alternative contemplated a topsoil sand mix of not less than 15%; nor more than 50%. By contrast, the Specifications contemplated a sand mixture of up to 85%, depending on the soil mix locations. When Grunley-Walsh communicated this bid/price to the Park Service (Mike Donnelly and Mike Fox), they agreed with the topsoil alternative concept proposed by Cherry Hill because of the significant price saving that would be achieved.

Thereafter, by email dated Monday, November 24, 2003 (copy attached as **EXHIBIT 6**) the Park Service (Mike Donnelly), forwarded to Grunley-Walsh a "Request for Price Proposal, Task Order #35". Even though this email was received the day before the November 25, 2003 drawings and specifications were issued, the RFP attached to the email stated, "[w]e request that you provide your price proposal directly to this office no later than November 25, 2003." The RFP also stated, **"[t]his Request for Price Proposal should be based on the 100% complete Specifications and Drawings for the referenced project."**

At the time (i.e., November 24, 2003) a 100% complete set of Specifications and Drawings did not exist for the project. Rather, all that existed was a 100% set of Design Development Specifications and Drawings, which specifically stated they were "NOT FOR CONSTRUCTION".

The email accompanying the Park Service's RFP also advised Grunley-Walsh the Park Service wanted to "negotiate" the RFP on Wednesday morning (i.e., November 26, 2003). A price proposal was submitted by Grunley-Walsh on November 25, 2003 and negotiations did, in-fact, occur on November 26, 2003. During these negotiations it was made clear to the Park Service that Grunley-Walsh's site work price was from Cherry Hill, in the amount of $3,185,864, which included Cherry Hill's proposed alternative for topsoil (in lieu of the specified soil mix requirements). In fact, a copy of Cherry Hill's bid proposal (**EXHIBIT 4**) was provided to the park service as part of Grunley-Walsh's price submission.

As a result of the parties' negotiations, on Wednesday, November 26, 2003 Grunley-Walsh provided/emailed the Park Service their "Final, Final, Final, Proposal" in the total amount of $13,993,215.96 (copy attached as **EXHIBIT 7**). In this proposal, the Site Work price was identified as a specific line item, in the amount of $3,185,864; representing the bid amount Grunley-Walsh received from Cherry Hill, premised on Cherry Hill's alternative top soil approach.

Grunley-Walsh's "final, final, final, proposal" to the Park Service was not immediately accepted. After submission of the "final, final, final, proposal", the Government was closed for the Thanksgiving holiday. Eventually, on Friday, December 5, 2003, Grunley-Walsh understood the Park Service accepted the "final, final, final, proposal" when the Park Service issued Task Order No. 35, for the lump sum amount of $13,993,216 – the exact amount of Grunley-Walsh's proposal (rounded-up by 4¢ to the nearest dollar).

As stated above, the Task Order and the accompanying Attachment 1, both indicated they included the work in the "construction drawings and specifications prepared by Olin Partnership (DWG. #087/41032)." What this "DWG #087/41032" refers to has always been a mystery. As of December 5, 2003, the latest set of drawings and specifications which had been issued by Olin Partnership were dated November 25, 2003 and indicated they were "NOT FOR CONSTRUCTION". These specifications also contained the same Section 02920 (copy attached as **EXHIBIT 8**) which set forth the requirements for "Soil Preparation", including the requirements for various topsoil mixes to be utilized in different locations around the project site. In this regard, at the time the November 25, 2003 specifications were issued, the Olin Partnership was unaware of the discussions between Grunley-Walsh and the Park Service concerning Cherry Hill's alternative top soil approach.

## 2. Legal Principles

Human beings make mistakes. It happens all the time. It even happens in contracting. For this reason, we understand the law of contracts recognizes the concepts of mutual mistake and unilateral mistake. Further, we understand that were contract mistakes occur, reformation is required to set forth the true intent of the parties. The Court of Appeals for the Federal Circuit recently discussed these concepts in *National Australia Bank v. U.S.*, 452 F.3d 1321 (C.A. Fed. 2006),stating:

> An erroneous mutual belief about the contents of a written agreement is sufficient to constitute a "mistake"; for this purpose: reformation is available " 'when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing.' " *Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8*, 314 F.3d 895, 903-04 (7th Cir.2003) (quoting Restatement (Second) of Contracts, § 155, cmt. a (1981)); *see also* *Philipine Sugar Estates Dev. Co. v. Gov't of Philipine Islands*, 247 U.S. 385, 389, 38 S.Ct. 513, 62 L.Ed. 1177 (1918) (noting that "[i]t is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties," and that "[t]he fact that interpretation or construction of a contract presents a question of law and that, therefore, the mistake was one of law is not a bar to granting relief.").

Where, as in this case, a mutual mistake is evident based on the contract itself and the parties contemporaneous conduct, looking beyond the words used in the contract becomes essential for determining the true intent of the parties. Task Order No. 35 refers to drawings and specifications prepared by Olin Partnership under previous Task Order. It doesn't identify what drawings and specifications, except for a reference to "DWG #087/41032", which Grunley-Walsh has never received. The May 2003 drawings are much different than the November 2003 drawings. Likewise, the May 2003 specifications are much different than the November 2003 specifications. Moreover, both the May and the November drawings and specifications expressly indicate they are "NOT FOR CONSTRUCTION." Clearly, the design was still a "work in progress." Thus, these facts by themselves raise questions that can not be answered by looking at just the "four corners" of Task Order No. 35.

What did the Park Service intend? What did Grunley-Walsh intend? Who was providing the design? And, more importantly, who was the scrivener of the Task Order? These questions can be answered, simply by looking at the pre-award history of Task Order No. 35. Clearly, Grunley-Walsh was responsible for providing a design that would work within the Park

Service's budget. This was an open process. Bid prices were disclosed and discussed with the Park Service. The final Task Order amount was negotiated based on facts both parties had within their possession. One such fact was the top soil alternative, which had been proposed and agreed upon due to cost considerations.

3. **The Top Soil Change Work Required**

Despite the understandings between Grunley-Walsh and the Denver office of the Park Service concerning the alternative top soil approach, as work on the Project proceeded and it became time to begin the top soil operation, it became apparent the local Park Service representatives were uninformed about the pre-award discussions concerning the topsoil alternative to be provided by Cherry Hill. However, the local Park Service representatives did recognize the top soil sand content contemplated by the specifications was excessive. As such, the requirements of the specifications were abandoned.

In this regard, the Chief Arborist for the local DC Park Service, Rob DeFeo, issued a Memorandum on March 23, 2005 (copy attached as **EXHIBIT 9**), setting forth what he believed to be the "Best Practices" for topsoil in the Washington DC region. His Memo indicated that, in top soil for both seed and soding purposes, the sand mix should be 60% to 65%. Although such a sand mix ratio was less than the specified ratio, it was still a great deal higher than what Grunley-Walsh and Cherry Hill had contemplated at the time the lump sum price for Task Order No. 35 was negotiated.

Shortly after receipt of the March 23, 2005 "Best Practices" Memorandum, Grunley-Walsh received an undated letter from the Contracting Officer (copy attached in **EXHIBIT 10**). This letter stated, "[t]he Park Service has provided 'Best Practices' for soil preparations that reflect what is in the specification."[2] Although Grunley-Walsh disagreed, we reasonably

[2] The Contracting Officer's letter also stated that 6" of topsoil (as opposed to 12") was required per the contract.

understood the Park Service was now directing Grunley-Walsh to provide topsoil with a sand mix of 60% to 65%. In addition, the Contracting Officer's letter indicated the top soil was to receive a "soil amendment" (i.e. known as "leaf grow"). These requirements were a contract change and a change from what had been agreed upon at the time the Task Order lump sum amount had been negotiated.

Thereafter, at a meeting with the Park Service on March 30, 2005, Grunley-Walsh again reiterated their position that any requirement by the Park Service to provide topsoil different from the topsoil alternative (i.e., the DC DPW Standard of 15% to 50% sand) agreed upon at the time of contracting would be a change for which Grunley-Walsh expected payment. The next day, Grunley-Walsh received an April 1, 2005 self serving letter from Mr. Giller of the Park Service (copy attached in **EXHIBIT 11**), which misstated what was discussed at the March 30th meeting. However, the letter again reiterated Grunley-Walsh was to provide topsoil prepared in accordance with their "Best Practices". In doing so, the Park Service now stated:

> The 'Best Practices' supersedes the specifications with respect to the proportion of sandy loam and organics. The percentage of sand is reduced.[3]

Again, this represented a contract change and a change from what had been agreed upon at the time the Task Order lump sum amount had been negotiated. However, at least the Park Service recognized the specifications were being abandoned (i.e. superseded). Nevertheless, Grunley-Walsh still maintained its position that any requirement by the Park Service to provide top soil different from the agreed upon top soil alternative would be a change for which Grunley-Walsh expected payment.

---

[3] The Park Service's letter of April 1, 2005 also stated that 6" of topsoil (as opposed to 12") was required per the contract.

Thereafter, at a jobsite meeting on April 22, 2005, the Park Service continued to dictate changed requirements for preparation of the top soil, including an inefficient procedure for placing the topsoil and ripping the subsoil 16" to 22". A copy of the April 22, 2005 Meeting Minutes is attached as **EXHBIT 12**. This was not acceptable to Grunley-Walsh. By our letter dated April 25, 2005 (copy attached in **EXHIBIT 13**), Grunley-Walsh told the Park Service the exact procedure we would be following.

On May 2 through 6, 2005, some initial loads of topsoil were delivered to the Project site. Grunley-Walsh had this top soil tested and, by transmittal dated May 13, 2005 (copy attached in **EXHIBIT 14**), provided the test results to the Park Service. In doing so, Grunley Walsh noted the top soil satisfied the DC DPW standards for top soil; having a sand content of no more than 50%.

By letter dated May 17, 2005 (copy attached in **EXHIBIT 15**), the Park Service rejected the top soil; stating "a significant amount of additional sand is necessary to meet the contract required topsoil gradation." Again, Grunley-Walsh disagreed. However, by letter dated May 17, 2005 (copy attached in **EXHIBIT 16**), Grunley-Walsh acknowledged that it would proceed in accordance with the Park Service's directives. Thereafter, the Invoice Statements from Campbell Sand & Gravel Company (copies attached in **EXHBIT 17**), establish that Grunley-Walsh had over 2,616 tons of sand delivered to the Project site during the period between May 19, 2005 and June 24, 2005.

In addition, to comply with the Park Service's directives, Grunley-Walsh was required to purchase 3,500 yards of "leaf grow" (dark brown in appearance) from our Subcontractor, Davey Tree. Then began the arduous and time consuming process of mixing the sand, the top soil and the leaf grow for spreading and placement prior to sodding.


Loads of "Leaf Grow" Material
Loads of Delivered Sand


Loads of "Leaf Grow" Material
06/12/2005 13:21



Mixing Sand, Leaf Grow and Top Soil




Mixing Sand, Leaf Grow and Top Soil

**Quantum Overview**

The additional costs sought in this claim is for work performed materials supplied by our subcontractors, Cherry Hill Construction Company (submitted in RCO's 951.34, 951.38, 951.38.01, 951.38.02, 951.47.01, 951.47.02, 951.47.03 and 951.64), Davey Tree, Alpine Services and Cambell Sand & Gravel. Cherry Hill's costs are supported by daily work tickets, which indicate the work which had to be performed. The total cost to our Subcontractors / Suppliers for this change work amounts to $238,912. Mark-ups allowed to Grunley-Walsh for this change work totals an additional $20,951. When added to our Subcontractor / Supplier cost, the total amount claimed is $259,863.

**Certification**

In accordance with the Contract Disputes Act:

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amounts requested accurately reflect the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

Sincerely,

**GRUNLEY-WALSH, LLC.**

Bassem Soueidan
Operations Manager

Enclosures
cc: Roger C. Jones, Esquire (w/encls.)
Cherry Hill Construction (w/encls.)
Davey Tree (w/encls.)